ORIGINAL

JUDGE GARDEPHE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - -  x

**22 CRIM 597**

UNITED STATES OF AMERICA          :

       -v.-                      :

GAL LUFT,                          :

          Defendant.             :

- - - - - - - - - - - - - -  x

SEALED INDICTMENT

22 Cr.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11\1\22

**BACKGROUND**

1.   For years, GAL LUFT, the defendant, a dual U.S.-
Israeli citizen, and others known and unknown, engaged in
multiple international criminal schemes, including a scheme to
act within the United States to advance the interests of the
People's Republic of China ("China") as agents of China-based
principals, without registering as foreign agents as required
under U.S. law.  Specifically, LUFT agreed with others to and
did: (1) covertly recruit and pay, on behalf of principals based
in China, a former high-ranking U.S. Government official,
including while the former official was an adviser to the then-
President-elect, to publicly support certain policies with
respect to China without LUFT or the former official filing a
registration statement as an agent of a foreign principal with
the Attorney General of the United States, in violation of the
Foreign Agents Registration Act; (2) broker and attempt to
broker multiple illicit weapons deals, in violation of the Arms

Export Control Act, and subsequently lied to U.S. law
enforcement agents about that conduct; and (3) broker and
attempt to broker deals for Iranian oil, without authorization,
in violation of U.S. sanctions against Iran and the
International Emergency Economic Powers Act, and subsequently
lied to U.S. law enforcement agents about that conduct.

### SUMMARY OF CERTAIN RELEVANT INDIVIDUALS AND ENTITIES

#### GAL LUFT and the Think Tank

2.    GAL LUFT, the defendant, was born in Israel and became
a naturalized United States citizen in or about 2004.  At all
times relevant to this Indictment, LUFT, who has a PhD in
strategic studies from a U.S. university in Maryland, served as
the co-director of a Maryland-based non-profit think tank (the
"Think Tank"), which described global energy security as its
focus.  From approximately 1998 until in or about November 2017,
LUFT principally resided in Maryland, and traveled
internationally, including to China, for speeches, conferences,
and meetings.  Since the arrest of an associate ("CC-1") on
different U.S. charges in mid-November 2017, LUFT has remained
outside the United States.

### *Individual-1 and the Energy Group*

3.    At all times relevant to this Indictment, the Think Tank organized and managed what it referred to as "projects," including a project involving a group of individuals who formed what the Think Tank described as a "cabinet level extra-governmental advisory committee" focused on diminishing the strategic importance of oil to the United States (the "Energy Group").

4.    A former senior U.S. government official ("Individual-1") co-founded the Energy Group, of which GAL LUFT, the defendant, served as a senior adviser during all times relevant to this Indictment.

### *CC-1 and China Energy Fund Committee*

5.    At all times relevant to this Indictment, CC-1, a Chinese national who formerly served as the Secretary for Home Affairs of Hong Kong, was the head of China Energy Fund Committee ("CEFC"), a non-governmental organization based in Hong Kong and Virginia which had "special consultative status" with the United Nations.  CEFC was funded by a Chinese oil and gas conglomerate, CEFC China Energy Company Limited ("CEFC China").  CC-1 was, at all relevant times, principally based in

3

Hong Kong, though traveled frequently to the United States, particularly to New York, New York, and Washington, DC.

6.    In or about summer 2015, CC-1 offered GAL LUFT, the defendant, annual payments of $350,000 from CEFC to the Think Tank.  In return for this annual payment, CC-1 and LUFT agreed that (1) the Think Tank and CEFC would jointly host an international meeting in a major United States city on energy security issues; (2) the then-chairman of CEFC China would get an honorary position with the Energy Group, and (3) a member of the Energy Group would become a senior advisor to CEFC.

7.    In or about December 2015, CEFC sent the Think Tank $350,000.

8.    Just over a year later, in or about January 2017, CEFC China sent the Think Tank $350,000.

9.    Starting in or about 2015, and continuing into in or about November 2017, the Think Tank and CEFC co-sponsored or jointly held multiple conferences, including one in June 2017 in Beijing, China, at which both GAL LUFT, the defendant, and CC-1 spoke.  In or about the same time period, LUFT described himself in publications he wrote as a senior adviser to CEFC.

4

### *CC-2 and the Chinese Defense Company*

10.  At all times relevant to this Indictment, a certain individual ("CC-2") served as the president of a Hong Kong company ("CC-2's Company") that was described as being "in the fields of infrastructure, energy, defense and logistics," and worked as an agent or representative of a particular Chinese defense company (the "Chinese Defense Company"), for which CC-2 formerly served as an executive.  GAL LUFT, the defendant, told CC-2 in an April 2015 email that "I really enjoyed meeting you. I'm sure we can have a lot of fun while making $$."

### OVERVIEW OF THE SCHEMES

11.  As described in more detail below, GAL LUFT, the defendant, agreed with CC-1 to act on behalf of foreign principals, including CC-1 and CEFC, while CC-1 and CEFC provided or arranged for funds to be provided to or for the benefit of LUFT.  Among other things, LUFT agreed to work on behalf of CC-1, CEFC, and CEFC China, persons and entities outside of the United States, to recruit and "educate" Individual-1 so that Individual-1 would make public statements, at the request of LUFT and CC-1, which were in the interest of China, such as through a written "interview" between CC-1 and Individual-1 in which LUFT drafted Individual-1's responses and

included information that was favorable to China, which "interview" CC-1 then transmitted to multiple persons in the United States.

12.   Furthermore, as described in more detail below, GAL LUFT, the defendant, agreed and attempted to broker arms transactions with CC-1, other Chinese individuals and entities, and others, including illicit weapons deals involving Libya, the United Arab Emirates, and Kenya.  In his role as a broker or middleman, LUFT worked to find both buyers and sellers of weapons and other materials constituting "defense articles" on the United States Munitions List, without a license to do so, in violation of the Arms Export Control Act.  Among other things, LUFT traveled to meetings and received and passed on documentation (such as an end-user agreement) needed to secure the deals.  In this role as a broker for illicit arms deals, LUFT worked on a commission basis.

13.   Additionally, as described in more detail below, GAL LUFT, the defendant, agreed and attempted to broker deals for Iranian oil--which he directed an associate to refer to as "Brazilian" oil instead.  In his role as a broker or middleman, LUFT solicited buyers and passed on pricing and other information.  He also assisted in setting up meetings between

Iranian representatives and CEFC China for the purpose of discussing oil deals, all in violation of U.S. sanctions against Iran and the International Emergency Economic Powers Act.

**COUNT ONE**

(Conspiracy to Act as an Unregistered Agent of a Foreign Principal)

The Grand Jury charges:

14.   The allegations set forth in paragraphs One through Thirteen are incorporated by reference as if set forth fully herein.

Statutory Background: Foreign Agents Registration Act

15.   The Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq.*, is a registration and disclosure statute that requires any person acting in the United States as "an agent of a foreign principal" to register with the Attorney General if he or she is engaging, directly or through another person, in certain types of conduct, such as political activities, political consulting, public relations, or publicity activities, for or in the interest of the foreign principal. Such registrations are made to the National Security Division's Foreign Agents Registration Act Unit ("FARA Unit") within the U.S. Department of Justice.   It is a crime to knowingly and

willfully fail to register, or to make false and misleading statements or material omissions in documents submitted to the FARA Unit under the law's provisions.

16.    The purpose of FARA is to prevent covert influence by foreign principals.  Proper registration under the statute allows the United States Government and the American people to evaluate the statements and activities of individuals who are serving as agents of foreign principals in light of their status as foreign agents.  Among other things, a FARA registration reveals the identity of the foreign principal on whose behalf a registrant performs services, the type of services the registrant provides the foreign principal, the source and amount of compensation the registrant receives from the foreign principal, and any political campaign contributions made by the registrant while the registrant was acting as an agent of the foreign principal.

<u>LUFT's Scheme to Violate FARA</u>

17.    As described in more detail below, among other things, GAL LUFT, the defendant, agreed to and did engage in political activities in the United States on behalf of CEFC, CEFC China, and CC-1, in an effort to seek to influence United States foreign policy toward and the public perception of China, and

8

concealed these efforts by creating the false appearance that they were simply the sharing of sincere opinions of an independent expert on national security and international relations.

18.   Starting in or about October 2015, GAL LUFT, the defendant, began sending information to Individual-1 concerning, among other things, "One Belt, One Road," later known as the "Belt and Road Initiative," a foreign policy initiative of the Chinese government.  LUFT, while in the United States, also invited Individual-1 to what LUFT described in an email as a "private meeting" in Washington, D.C., with the then-chairman of CEFC China, who LUFT wrote "has very close relations with President Xi Jinping [i.e., the President of China]."[1]

19.   On or about September 12, 2016, GAL LUFT, the defendant, sent CC-1 an email with the subject line, "We nailed it!" that included a link to an article announcing that Individual-1 was advising a then-candidate for President of the United States, who was elected President two months later.  CC-1

---

[1] The statements and communications described in this Indictment are set forth in substance and in part, unless otherwise indicated.  Typographical and other errors in quotations are reproduced as they appear in the original communications, unless otherwise indicated.

responded by asking if he could attend a dinner that Individual-1 was hosting in New York, New York, and LUFT confirmed by informing CC-1 that he had "rsvpd" for CC-1.

20.   Later the same month, on or about September 29, 2016, using a code name for Individual-1, GAL LUFT, the defendant, while in the United States, sent CC-1 an email advising that he had successfully recruited Individual-1, for a fee: "All set. We agreed on 60 for phase I and he [i.e., Individual-1] won't be taking a position w others.  He is eager to launch the channel. Pls lock your side and see when they want to bring him in or meet elsewhere."

21.   The same day, CC-1, who was staying in New York, New York, responded, "I can assure you that there is no problem absolutely from our side.  Our side is more than happy to have someone we know to be the channel with [first letter of then-presidential candidate's last name][.]  As things develop, the engagement will evolve into more established and fluent structure."  GAL LUFT, the defendant, responded that "he [i.e., Individual-1] needs to be better educated and versed in our narrative so the other side doesn't shape his views."

22.   A few days later, on or about October 3, 2016, CC-1 informed GAL LUFT, the defendant, via email that the then-

chairman of CEFC China "agrees with the proposal for"
Individual-1 (referred to by code name), and that the "[p]lan is
for me to deal with [Individual-1] first.  After November 8
[i.e., the United States presidential election], if it all pans
out, [Individual-1] will be invited to China undercover."  In a
later email in the same email chain, CC-1 told LUFT that "the
plan" for Individual-1 was to publish one article per week in
the four weeks before the election as a "dialog with
[Individual-1]," and if Individual-1 could write "some notes" on
certain topics, "we shall build stories around them."

        23.  The next day, CC-1 wrote to GAL LUFT, the defendant,
suggesting certain topics "on various Sino-US issues" for the
Individual-1 articles.  In response, LUFT stated, "I will
probably have to ghost [write] this for him [i.e., author the
content for publication under Individual-1's name]."  LUFT also
informed CC-1 that LUFT had been told that Individual-1 was
going "to lead the international security/china/iran policies
for the actual [presidential] transition team!"  CC-1 responded:
"Impressed!  In these articles, we do not want to spill all the
beans yet, just enough to let 'people' know he [i.e.,
Individual-1] is in the corridor of power to be.  Just broad

stroke policy consideration that leaves plenty of room for interpretation and imagination to be filled in later."

24.   Several days later, GAL LUFT, the defendant, sent CC-1 a draft of the answers LUFT had written for Individual-1's side of the purported "dialogue," and wrote to CC-1, "note the scoop in q3 [i.e., question three]."   LUFT's drafted response to question 3 included a reference to "the emergence of a grand bargain in which the U.S. accepts China's political and social structure and commits not to disrupt it in any way in exchange for China's commitment not to challenge the status quo in Asia."

25.   At or about the same time, GAL LUFT, the defendant, emailed the then-spouse of Individual-1 ("Individual-2"), and stated, "we can begin to immediately provide you with a monthly stipend of 6k to help cover for lost revenues."   LUFT further proposed a series of articles to be published in mainland China and Hong Kong newspapers--"one article per week for 4 weeks in a row up until the [U.S.] elections"--that would be structured as a purported "dialogue" with Individual-1 "on aspects of China-US relationship."   LUFT added, in the same email, that he was "glad to ghost [write] for [Individual-1] if needed or he can send notes and we can mesh this into the dialogue.   The idea is to

project a sense of hope and optimism for a positive US-China relations."

26.   On or about October 13, 2016, GAL LUFT, the defendant, emailed Individual-2 a link to the first of the purported "dialogue" articles in China Daily, an English-language daily newspaper distributed worldwide, including in the United States. China Daily's New York-based distributor, China Daily Distribution Corporation, has been recognized by the United States Department of State as a foreign mission under the Foreign Missions Act, meaning it is "substantially owned or effectively controlled" by a foreign government (here, China), and has registered under FARA for engaging in registerable activities for a foreign principal (China Daily).   The same day, CC-1 emailed a link to the same article to a number of individuals, including a professor at a university in New York, New York, a professor at a university in Washington, DC, and an official at the United Nations, with the subject line: "A conversation with [Individual-1] (Part I): World Policeman Fatigue?   China Focus."

27.   On or about October 18, 2016, Individual-2 sent GAL LUFT, the defendant, a one-page "Consulting Services Agreement" signed by Individual-1, with an unsigned signature line for the

individual who was LUFT's Co-Director of the Think Tank, which
stated that Individual-1 would receive "an annual sum of $72,000
. . . , payable in monthly payments of $6,000" in exchange for
Individual-1's provision of "advice on energy and global
security" and service as "Co-Chairman of the [Energy Group], a
project of [the Think Tank]."  No mention was made of CC-1,
CEFC, CEFC China, the publication of articles in China Daily or
other papers, the dissemination of those articles in the United
States, or the public support of certain policies concerning
China.

28.  On or about October 25, 2016, CC-1 emailed links to
the second and third articles of the purported "dialogue" in
China Daily to a number of individuals, including the same
professor at the Washington, DC university to whom CC-1 had sent
his October 13, 2016 email, as well as another professor at the
same university, two officials at the United Nations, and the
former president of the U.S. arm of a multinational oil company
who was a member of the Energy Group.  The third article
included, word for word, the same statement regarding the
emergence of a "grand bargain" referenced in paragraph 24 above
that GAL LUFT, the defendant, had written for Individual-1 to
appear to say and to support.

14

29.   On or about November 9, 2016, CC-1 attached the four completed articles of the purported "dialogue" in China Daily to an email sent to a number of individuals, including professors at the New York, New York university and the Washington, DC university, officials at the United Nations, a senior associate at a non-profit policy research organization in Washington, DC, a vice president at a New York-based investment bank, and an employee of a U.S.-based Chinese news organization, with the subject line, "Dialogue between [CC-1] and [Individual-1], [the President-elect's] Advisor on China."   GAL LUFT, the defendant, while in the United States, forwarded the email and attached articles to Individual-2.   The articles, which were accompanied with photographs of Individual-1 and CC-1, each began with an "editor's note" that stated: "China Energy Fund Committee (CEFC) hosted its 10th Sino-U.S. Colloquium in Washington DC on September 26, seeking to identify a 'U.S.-China Policy for the Next Administration.' After that, [CC-1], deputy chairman and secretary general of CEFC, has a conversation with [Individual-1], . . . who is currently serving as a senior adviser to [the U.S. political party] presidential nominee . . . , on the pressing issues of China-US relations. The conversation has been edited into 4 pieces and will be posted once a week."   The note

15

did not disclose, among other things, that (a) the so-called "conversation" was both pre-written and substantially drafted by or at the direction of CC-1 and LUFT, not Individual-1; (b) CEFC, CC-1, and the Think Tank had an ongoing relationship, including that CC-1 had arranged to pay the Think Tank hundreds of thousands of dollars per year; or (c) Individual-1 was being paid by the Think Tank, as agreed upon between CC-1 and LUFT.

30.  In response to CC-1's email containing links to the four articles, GAL LUFT, the defendant, while in the United States, emailed CC-1 that "tucked between the lines is a call for a 'grand bargain' which can set the tone for new power relations. We should explore this."

31.  On or about November 12, 2016, CC-1 emailed GAL LUFT, the defendant, that "[e]ver since the publication of the articles of my 'dialogue' with [Individual-1] in Hong Kong and in the mainland, [he] is now a household name among the USA watchers in HK and in China.  But I should think that he should hide for now, come to China on a silent trip first, then surface to speak out on [the President-elect's] foreign policies just before his inauguration or thereafter."  LUFT responded that "[w]e are debating about his role in the new admin.  There are all kinds of considerations . . . .  We should talk ftf [i.e.,

16

face-to-face] as there can be a supremely unique opportunity for china."

32.  On or about November 13, 2016, GAL LUFT, the defendant, and CC-1 exchanged emails about the potential role of Individual-1 in the new presidential administration.  LUFT reported that "[o]ur friend is now on the shortlist of the following:  Sec Def[,] Sec homeland security[, and] Dir nat intel."  CC-1 replied that "[t]his side would like to see him assuming something with a 'China' profile.  Of the three, S of D [i.e., Secretary of Defense] or DNI [i.e., Director of National Intelligence] would be good, esp the former."  LUFT wrote to CC-1 that "DNI is most likely," and CC-1 responded later in the email chain that "may be you could reserve his 'direct' China link as the weapon of last resort."

33.  On or about October 31, 2016, an invoice "[f]or professional consulting services per contract," without elaboration, was sent on behalf of Individual-1 to the individual who was Co-Director with GAL LUFT, the defendant, of the Think Tank for the period October 15 to November 14, 2016, i.e., the period during which LUFT and CC-1 orchestrated and disseminated the purported "dialogue" promoting Chinese interests described above.

17

34.   On or about November 16, 2016, the Think Tank transmitted $6,000 to an account of Individual-1 in the United States, the first of monthly such payments which continued into in or about October 2017.

35.   On or about November 26, 2016, Individual-1 emailed GAL LUFT, the defendant, a draft email Individual-1 planned to send to a recently-announced advisor to the then-President-elect offering Individual-1's assistance and describing his experience in government and cybersecurity; Individual-1 did not mention China in his draft email. Several hours later, LUFT emailed back an edited version, writing to Individual-1 that LUFT had "flagged a few other areas where he [the advisor] might need help and its good that he knows you have capabilities that might come handy." LUFT's draft included the following new language: "I would also like to offer my support in dealing with some of the countries with which I have gathered unique access to top leadership, especially China (including relations that can also be handy in addressing North Korea) and Libya which I believe should be a top priority after years of neglect by the [prior presidential] administration." Individual-1 sent LUFT's version of the email, including the language quoted above, to the advisor.

36.   On or about December 1, 2016, CEFC, the Think Tank, the Development Research Center of the State Council of China, and another organization held "The Belt & Road Forum" in Washington, DC, during which both CC-1 and Individual-1, who was identified as a senior adviser to the President-elect, spoke. Individual-1 stated: "We want to joyfully participate with China in international trade operations and economic growth. I think we have no reason why China and the US cannot be close and friendly nations."

37.   In or about 2017, CC-1 and Individual-1 both appeared together and spoke at additional events, including at an event in Hong Kong hosted by CEFC in February 2017 and an event in Washington, DC in June 2017.   In reference to the February 2017 event and in response to an email from GAL LUFT, the defendant, about two Chinese individuals who were interested in meeting with Individual-1 during his trip, CC-1 emailed LUFT that Individual-1 and Individual-2 (both referred to by code name in CC-1's email) "are being brought to HK [i.e., Hong Kong] and BJ [i.e., Beijing] by us, CEFC and 'friends.'   They are our guests. Anybody wishing access to the guests should go through the host."

38.   At least in or about April 2017, during the period of
his work for CEFC and CC-1 described above, GAL LUFT, the
defendant, was aware of FARA, and indeed, he told two different
individuals about the U.S. requirement of registering as a
foreign agent in order to undertake certain actions (actions
unrelated to his work related to China).   In an April 6, 2017
email to a foreign government official who had requested "an
official invitation from the U.S.A. government" for another
foreign government official to visit the United States, LUFT
wrote that "I may have to file for foreign agent registration
before I can advocate for such a meeting with the USG."   And in
an April 18, 2017 email to Individual-2, LUFT mentioned a
possible lobbying job for a foreign official or government that
Individual-2 may be able to get, but noted that "this will
entail working outside the Government and under FARA
registration."

39.   In or about November 2017, CEFC invited Individual-1
to speak at the upcoming "Sino-US Colloquium (XII): Toward a
broader US-China agenda" in Washington, DC (the "Colloquium").
On or about November 2, 2017, CC-1 sent an invitation to
Individual-1 that described the Colloquium as "aim[ing] to
improve the understanding of North American policymakers of

20

Sino-US relations and to seek constructive ways for the U.S. and China to work together to maintain regional stability and advance economic dynamism in Asia Pacific." On or about November 20, 2017, Individual-1 spoke at the Colloquium.

40. According to checks of its database by the U.S. Department of Justice's FARA Unit in or about November 2022, none of GAL LUFT, the defendant, CC-1, Individual-1, or Individual-2 has ever registered under FARA for work related to Chinese foreign principals.

## STATUTORY ALLEGATIONS

41. From at least in or about October 2015 through at least in or about November 2017, in the Southern District of New York, China, and elsewhere outside of the jurisdiction of any particular State or district of the United States, GAL LUFT, the defendant, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, to knowingly and willfully act as an agent of a foreign principal, namely, CEFC, CEFC China, and CC-1, without registering with the

21

Attorney General, in violation of FARA, 22 U.S.C. §§ 612 and 618.

## OVERT ACTS

42.   In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed and caused to be committed in the Southern District of New York and elsewhere:

a.   On or about September 21, 2016, several days after GAL LUFT, the defendant, sent CC-1 an email with the subject line, "We nailed it!" that included a link to an article announcing that Individual-1 was advising a then-candidate for President of the United States, LUFT and CC-1 attended a party for Individual-1 in New York, New York, which Individual-2 told LUFT other advisers to the candidate were also expected to be present at.

b.   On or about September 29, 2016, using a code name for Individual-1, GAL LUFT, the defendant, sent CC-1 an email that stated: "All set.  We agreed on 60 for phase I and he won't be taking a position w others.  He is eager to launch the channel.  Pls lock your side and see when they want to bring him in or meet elsewhere."

  c. On or about November 9, 2016, CC-1 emailed four completed articles of a purported "dialogue" in China Daily to a number of individuals, including professors at universities in New York, New York and Washington, DC, officials at the United Nations, a senior associate at a non-profit policy research organization in Washington, DC, a vice president at a New York-based investment bank, and an employee of a US-based Chinese news organization, with the subject line, "Dialogue between [CC-1] and [Individual-1], [the President-Elect's] Advisor on China."

  d. On or about November 2, 2017, CC-1 invited Individual-1 to speak at the "Sino-US Colloquium (XII): Toward a broader US-China agenda" in Washington, DC.

  (Title 18, United States Code, Sections 371 and 3238.)

## COUNT TWO

  (Conspiracy to Violate the Arms Export Control Act)

  The Grand Jury further charges:

  43. The allegations set forth in paragraphs One through Thirteen and Sixteen through Forty are incorporated by reference as if set forth fully herein.

Statutory Background: Arms Export Control Act

44.   At all times relevant to this Indictment, the Arms Export Control Act ("AECA") has authorized the President to control the export of defense articles deemed critical to the national security and foreign policy interests of the United States.   Among other things, the AECA authorizes the President to designate items as "defense articles" by listing them on the United States Munitions List ("USML").   In addition, the AECA imposes a registration requirement on certain individuals, including U.S. citizens wherever located, who engage in brokering activities with respect to the manufacture, export, import, or transfer of any defense articles or services. Section 2778(c) of the AECA establishes criminal penalties for any violation of Section 2778 or any rule or regulation promulgated thereunder.

45.   The United States Department of State, Directorate of Defense Trade Controls ("DDTC") implemented the statutory provisions of the AECA by adopting the International Traffic in Arms Regulations ("ITAR"), Title 22, Code of Federal Regulations, Parts 120 to 130.   These regulations, promulgated pursuant to Title 22, United States Code, Section 2778, established the USML, define a "defense article" as any item on

the USML, and require a license from the DDTC for certain persons engaged in the business of brokering activities of items listed on the USML.

46.   The USML is set forth at Title 22, Code of Federal Regulations, Part 121.1.   Category II of the USML, titled "Guns and Armament," includes "(a)(2) Mortars" and "(a)(4) Grenade launchers."   Category III of the USML, titled "Ammunition and Ordnance," includes "(a)(9) Ammunition . . . for the guns and armaments controlled in Category II."   Category IV of the USML, titled "Launch Vehicles, Guided Missiles, Ballistic Missiles, Rockets, Torpedoes, Bombs and Mines," includes "(a)(4) Anti-tank missiles and rockets" and "(a)(6) Bombs."   Category VIII of the USML, titled "Aircraft and Related Articles," includes "(a)(5) Unmanned aerial vehicles (UAVs) specially designed to incorporate a defense article."

<u>LUFT's Illicit Arms Trafficking Activity</u>

47.   As described in greater detail below, GAL LUFT, the defendant, worked to broker multiple deals to illicitly sell and deliver defense articles between foreign countries without having received a license or approval from the DDTC.   Among other things, LUFT worked to broker a deal for Chinese companies to sell certain weapons to Libya, including anti-tank launchers,

25

grenade launchers, and mortar rounds, all of which are on the USML. *See* 22 C.F.R. § 121.1, Category II(a), III(a) & IV(a)(4). LUFT also worked to broker deals for certain weapons to be sold to the United Arab Emirates, including arial bombs and rockets, both of which are on the USML. *See* 22 C.F.R. § 121.1, Category IV(a). LUFT also worked to broker deals for certain weapons to be sold by a Chinese company to Kenya, including unmanned aerial vehicles ("UAVs")--and specifically "strike" UAVs, which LUFT acknowledged "[t]he US doesn't want to sell[, . . .] hence the opportunity"--which are on the USML. *See* 22 C.F.R. § 121.1, Category VIII(a).

### *Libya*

48.   At least in or about March and April 2015, GAL LUFT, the defendant, engaged in communications with CC-1 regarding LUFT serving as an intermediary for illicit trafficking in arms, which LUFT and CC-1 generally referred to in code as "toys," with respect to Libya as well as Qatar, including while CC-1 was in New York, New York.  Among other things:

   a.   On or about March 10, 2015, CC-1, who was staying in New York, New York, emailed LUFT, stating, "through a close friend of mine in BJ [*i.e.*, Beijing], I can get you the toys needed in Libya, it's strictly a business deal and someone has

to foot the bill.  Let me know if an order is being placed."
LUFT replied, "Great.  Will meet them in the island and see
what's its about."

      b.   On or about March 18, 2015, LUFT advised CC-1
that LUFT had just returned from the island of Cyprus.

      c.   Also on or about March 18, 2015, CC-1 wrote to
LUFT, "yes, through our channel, we can sell you the toys for
Lybia."  LUFT replied a few minutes later, "good.  I will deal
with this next week.  when do we meet on other mischiefs?"

      d.   On or about March 25, 2015, LUFT emailed CC-1, "I
have the list and end user agreement. Pls advise next step."  On
the same day, CC-1 replied, stating in pertinent part, "Find a
way to pass them onto me and we can execute that right away,
BTW, who is footing the $."

      e.   On or about March 28, 2015, LUFT replied,
"Attached. we have the funding and processing mechanisms in
place. If it works nice there will be much more. Also for S.
Sudan."  The attachment to LUFT's March 28, 2015 email to CC-1
was a document dated November 18, 2014, which was headed "End
User Certificate," had a "Ministry of Defense" logo on the top
with an image similar to the star and crescent of the Libyan
flag, and was saved with the file name "LY032015.pdf,"

certifying that the user of the goods in question would be the
Ministry of Defense of the Republic of Libya.  The supplier of
the goods was listed as a company with an address in Amman,
Jordan.  The items listed on the document included anti-tank
launchers, grenade launchers, and mortar rounds.

      f.   On or about April 19, 2015, CC-1--who was staying
in New York, New York--sent an email to LUFT with the subject
header "Shopping lists."  The body of the email stated: "It so
turns out that Qatar also needs urgently a list of toys from us.
But for the same reason that we had for Libya, we cannot sell
directly to them.  Is there a way you could act as an
intermediary in both cases?  Could you ask your man to see if he
is willing?"

      g.   On or about the same day, LUFT replied: "Qatar
good chance bc there is no embargo. Libya is another case bc
going against an embargo is tricky."  Also on or about the same
day, CC-1 responded to LUFT, stating: "Qatar needs the toys
quite urgently.  Their chief is coming to China and we hope to
give them a piece of good news. Please confirm soonest."

      h.   On or about April 21, 2015, CC-1--who was staying
in New York, New York, and wrote that he had attended a CEFC
event at the United Nations that day--asked LUFT for "a quick

response from your PM office about being the middle man for
QaTar.  We need an answer soon."  LUFT replied that "isl [*i.e.*,
Israel] is not a good fit.  Same problem the [] Q [*i.e.*,
Qataris] have w uncle [*i.e.*, the United States].  Need a third
party.  Best africa or east europe.  I will activate.  The
question is:  can the Q be on the end user agreement or we need
two separate end users?"

     i.  On or about April 26, 2015, LUFT wrote to CC-1,
"Looks like we have a middleman for Q.  African.  I will get
final approval tomorrow.  Need the name of the supplier and the
list so we can issue an end user agreement.  The shipment can go
direct from China to Q preferably via sea.  Pls advise."  CC-1
replied on or about the same day, "Good, let me know if final
approval be given.  . . . Oh, one thing, who is paying, I.e.
From whom are we getting payments.  What are the commissions and
who gets them?  What does the middleman expect?"  In a response
the same day, LUFT stated, "the commission is 20pct including
the share of the third party."  CC-1 asked "[w]ho is the
middleman, not L [*i.e.*, Libya] in n. Africa under embargo I
hope."  LUFT replied, "no.  a totally kosher one.  they will
tell me f2f [*i.e.*, face to face] shortly."

    j.   On or about April 28, 2015, LUFT emailed CC-1
with the subject line "Q": "Its going to be Romania.  pls send
me the list for the end user."

    49.   GAL LUFT, the defendant, and CC-1 continued to try to
broker illicit arms deals involving Libya into 2016, including
while in New York, New York.  Among other things:

    a.   On or about April 3, 2016, LUFT emailed CC-1
about a meeting to be scheduled with certain Libyans who "[w]ill
also get us to [a particular Libyan individual] (who will
probably be number one or two or minister of defense) as there
will be great need for toys after the sanctions are lifted.  I
will begin to assemble a task force for all of their needs
(toys, energy, infrastructure, banking) so we are ready to roll
when the curtain is raised."  In subsequent emails on the
subject, LUFT told CC-1 that they should "discuss w [CC-2] that
he should talk w [the Chinese Defense Company] to represent them
there [i.e., in Libya] as currently they have no rep there.
This way everything goes through us."  As noted above, LUFT had
told CC-2 in an April 2015 email that "I really enjoyed meeting
you.  I'm sure we can have a lot of fun while making $$."

    b.   LUFT traveled to Paris in or about September 2016
to meet with a group of Libyans whom LUFT had described in prior

emails as "quite high level people coming to see us headed by a dep PM [*i.e.*, deputy Prime Minister]." Prior to the meeting, on or about September 5, 2016, CC-1 (copying LUFT) asked CC-2's assistant to forward an email to CC-2 describing plans for the meeting with the Libyans and stating that the Libyans "need infrastructures, banking services, internet and tele-communication set ups, and 'toys.'" After the meeting, LUFT told the Libyan official, "I thought the meeting was excellent. We will . . . draft the MOU [*i.e.*, Memorandum of Understanding]. We are leaving for US and after that [CC-1] will meet with [the then-chairman of CEFC China] to discuss next steps."

      c.   CC-1 had a second meeting with the Libyans that LUFT did not attend, and reported to LUFT afterwards that "[t]he key, I concluded, of his second meeting with me, was that after he had reported of our first encounter back to L [*i.e.*, Libya], he was asked to make a clear first request for a 'test run', TOYS! He further suggested that they will be asking the C [*i.e.*, Chinese] to help them building a 'simple' TOY factory in L in the near future, but he understand that many other steps will have to be successful before we will ever come to that !" LUFT responded to CC-1 that "[i]t's a big project which requires patience but we are good at that and will sooner or later yield

fruit.   The key is to maintain our exclusivity over the channel to C."

        d.   On or about September 22, 2016--a day on which CC-1 and LUFT were staying in New York, New York--CC-2 emailed LUFT that he was asking a different Chinese defense company (the "Chinese Defense Exporter") to issue CC-2's Company "a rep letter for Libya business," and included a draft letter stating that the Chinese Defense Exporter, "authorized by the Chinese government," was "looking forward to have business and cooperation with Libya, in trade and project contacting, through appropriate ways."   LUFT forwarded the email to CC-1 and responded to CC-2, "May I assume that the commission of [CC-1] and me will be taken care of by [CC-2's Company]?"

        e.   On or about October 28, 2016, CC-1, who was staying in New York, New York, emailed LUFT to suggest a convenient time for a Libyan delegation to visit China.   CC-1 wrote that the "[b]est time is the second half of December. Perfect working condition in China around Christmas time, no western interference.   Both BJ [*i.e.*, Beijing] (Toys) and SH [*i.e.*, Shanghai] ([first initial of the name of the then-chairman of CEFC China])."

### *The United Arab Emirates*

50.  GAL LUFT, the defendant, also worked to broker illicit deals in arms with respect to other countries, both with CC-1 and others, including individuals affiliated with CEFC and/or CEFC China.  One such country with respect to which LUFT worked to broker such deals, between approximately August 2015 and November 2015 and including while in the United States, was the United Arab Emirates ("UAE").  Among other things:

a.  On or about August 13, 2015, LUFT received an email from an individual affiliated with the Chinese Defense Company.  The email stated, "Mr. Luft: Good day!  Please kindly find attached quotation and technical specification for your reference.  For the Automatic rifle, we are glad to inform that 2011's stock can be ready for shipment in very short time.  But fur the aerial bombs, I am afraid the prices are very different from your expectation."  The email attached technical specifications for "5.56mm Automatic Rifle Type CQ," "250KG Low Drag Arial HE Bomb Type 3," and "500KG Arial HE Bomb Type 3" and a price quotation for these items.

b.  On or about the same day, LUFT sent two emails to the Chief Executive Officer ("CC-3") of a company with an address in Bulgaria.  One email attached the quotation

referenced above and the other attached technical specifications for the referenced weapons.  Based on a draft Hebrew translation, one email stated, "Update me that you received and we will talk. Pickup at Dar a Salam. Thanks. Gal."

         c.   The next month, on or about September 22, 2015, LUFT received an email with the subject "Rockets 107 mm" signed by CC-3.  CC-3 wrote: "Dear Gal, Kindly find attached the inquiry from" a particular defense company in Montenegro (the "Montenegrin Defense Company") "and quote a.s.a.p., incl. delivery time, time of production, the price of ex-stock and new."  The email attached a letter (the "Montenegrin Defense Company Letter") from the executive director of the Montenegrin Defense Company, addressed to CC-3, stating "We kindly ask you to check possibility to deliver up to 40.000 pcs.of rockets 107 mm from the stock or new production."

         d.   On or about the same date, LUFT sent an email addressed to CC-2, whom LUFT referred to by his first name, stating: "Please see the attached request for 40,000 107mm rockets. Please advise terms. We need it to go to Dar a Salam by ship and from there by air to UAE.  Would be better to have from stock but new is also fine. Best Gal."

e.   Three days later, on or about September 25, 2015, LUFT sent an email to the same email account and asked, "Can [the Chinese Defense Company] supply this product?"  On or about the same date, CC-2 responded, "Sorry, [the Chinese Defense Company] don't think they can do this deal."

f.   On or about the same day, after CC-2 stated that the Chinese Defense Company could not do the deal regarding 107mm rockets, LUFT sent an email to an individual with CEFC China ("CC-4").  The email stated in pertinent part: "Hope your trip home went well. I have a request for 40,000 107 rockets for UAE. Might you be able to find me a seller – preferably from stock? This is quite urgent. Thanks Gal."

g.   On or about September 28, 2015, CC-4 responded, "As you know do you have the document from UAE?"  On or about September 28, 2015, LUFT responded, "Not yet. They want to know if there is in stock before they hand it."

h.   On or about October 8, 2015, after the foregoing exchange regarding 107mm rockets for the UAE, CC-4 sent an email to LUFT, who was in the United States, stating: "I asked the related side.there no stocks this time.and they already summit the offer for them."  LUFT responded: "Thank you for the update. We will try other opportunities."

35

i.   On or about November 2, 2015, LUFT sent an email to CC-4, with the subject "Fwd: Rockets 107 mm," and attaching the Montenegrin Defense Company Letter.

j.   On or about November 18, 2015, CC-4 replied to LUFT, who was in the United States: "Mr Gal Luft, as you know the the capacity to produce the products is limited.so I suggest that you can order in advance to prepay so you can get a good price and you can get the products. other thing for the cash exchange I find away to discuss with you when we meet together."

### Kenya

51.   Another country with respect to which GAL LUFT, the defendant, worked to broker illicit arms deals was Kenya at least in or about March 2016.  Among other things:

a.   On or about March 22, 2016, LUFT sent an email to a particular person who was then a lawful permanent resident of the United States ("CC-5") with the subject line "Kenya," and wrote that the Chinese Defense Exporter is "a leading Chinese exporter of defense and aerospace systems" that "is now competing over a contract to sell 2-3 drones to Kenya."  LUFT wrote that "[t]he scope of the initial contract is over $20 million but this is only a reference for potential larger projects in Kenya and Africa writ large."  LUFT also noted that

36

"[the Chinese Defense Exporter]'s sole competitor in this deal is another Chinese company. [The Chinese Defense Exporter] doesn't have high level contacts in Kenya and is looking for ones.  The CEO is willing to travel to Kenya next month to introduce the products to local officials provided we can find the right person to plug him in."  LUFT asked CC-5 to "[p]lease advise."

     b.    On or about March 25, 2016, LUFT sent an email to CC-5: "Please see the attached letter explaining the background and the request for meeting in April.  [The Chinese Defense Exporter] will provide 10 percent commission to us for all business conducted in the country. Best Gal."  The attached letter was a letter to the Ministry of Defense of Kenya from the Chinese Defense Exporter, which described itself in the letter as a "state-owned international defense company authorized by the Chinese government."  The letter referenced previous discussions between Chinese Defense Exporter officials and Kenyan Ministry of Defense officials about the "CH-4B UAV system," *i.e.*, an unmanned aerial vehicle system, and requested a meeting to further discuss this and the Chinese Defense Exporter's other products.

c.   On or about March 28, 2016, CC-5 received an
email from an individual stating that it was "too late" because
the "MOD [*i.e.*, Ministry of Defense of Kenya]" had already
purchased six units from another source.   On or about the same
date, CC-5 forwarded this email to LUFT, who replied, "The six
units are just for surveillance while what [the Chinese Defense
Exporter] is offering are strike UAVs which is a different
project. The US doesn't want to sell them strike UAV hence the
opportunity."

52.   GAL LUFT, the defendant, continued to work to broker
illicit arms deals into at least in or about mid-2017.   On or
about June 18, 2017, LUFT sent himself an email attaching a "PSO
Equipment List," which included a description, quantity,
picture, and comments for a variety of military gear, ranging
from clothing and night vision goggles to armored vehicles and
mobile hospital trailers.   The "comments" column included notes
about the order being placed, such as quantity needed of each
size, and answers to questions that it appears the customer had
posed (*e.g.*, for a "British Army Soldier" combat suit, "We need
same pattern as the pictures?   Ans = Yes") or about details of
the order being placed (*e.g.*, for an armored vehicle, "Level of
armoring?   Ans = 4 inches"; "Do you want equipment integrated

38

(communication, grenade launchers, gunshot detection system,…and more) in the vehicle?  Ans = Yes").

53.  At all relevant times, GAL LUFT, the defendant, did not register with the State Department as a person engaged in brokering activities with respect to foreign defense articles or defense services, nor did he obtain a license from DDTC to engage in any export, re-export, or brokering activities.

### STATUTORY ALLEGATIONS

54.  From at least in or about March 2015 through at least in or about mid-2017, in the Southern District of New York, China, France, Cyprus, and elsewhere outside of the jurisdiction of any particular State or district of the United States, GAL LUFT, the defendant, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, to violate Title 22, United States Code, Section 2778.

55.  It was a part and an object of the conspiracy that GAL LUFT, the defendant, and others known and unknown, would and did willfully engage in the business of brokering activities with respect to the manufacture, export, import, and transfer of an

article listed on the USML and of a foreign defense article and defense service of a nature described on the USML, including anti-tank launchers, grenade launchers, mortar rounds, 5.56mm automatic rifles, arial bombs, rockets, and "strike" UAVs, without the required license or written approval of the DDTC, in violation of Title 22, United States Code, Sections 2778(b)(2) and 2778(c), and regulations promulgated thereunder.

<u>OVERT ACTS</u>

56.   In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed and caused to be committed in the Southern District of New York and elsewhere:

a.   On or about March 28, 2015, GAL LUFT, the defendant, wrote to CC-1 that "we have the funding and processing mechanisms in place," and attached an end-user certificate needed by CC-1 to execute the deal which certified that the user of the goods would be the Ministry of Defense of the Republic of Libya and listed, among other items, anti-tank launchers, grenade launchers, and mortar rounds.

b.   On or about September 25, 2015, LUFT contacted two individuals to try to obtain a source of 107mm rockets for a purchaser.

   c. On or about March 28, 2016, after being told that a potential buyer had already purchased unmanned aerial vehicle systems from another source, LUFT replied that the articles he was able to offer through the Chinese Defense Exporter were "strike UAVs which is a different project. The US doesn't want to sell them strike UAV hence the opportunity."

   d. On or about September 22, 2016, while both LUFT and CC-1 were staying in New York, New York, LUFT received an email from CC-2 regarding CC-2's Company obtaining from the Chinese Defense Exporter "a rep letter for Libya business," which LUFT forwarded to CC-1. CC-1 responded on or about the same day, "Please ask [CC-2] to clarify if we, you and I, are included in [CC-2's Company]," and on or about the next day, September 23, 2016, LUFT emailed CC-2, "May I assume that the commission of [CC-1] and me will be taken care of by [CC-2's Company]?"

   (Title 18, United States Code, Sections 371 and 3238.)

## COUNT THREE

   (Violation of the Arms Export Control Act -- Libya)

   The Grand Jury further charges:

   57. The allegations set forth in paragraphs One through Thirteen, Sixteen through Forty, and Forty-Four through Fifty-

Three are incorporated by reference as if set forth fully herein.

58.   From at least in or about March 2015, up to and including at least in or about September 2016, in the Southern District of New York, China, France, Cyprus, and elsewhere outside of the jurisdiction of any particular State or district of the United States and for which one of two or more joint offenders is expected to be first brought to and arrested in the Southern District of New York, GAL LUFT, the defendant, willfully engaged in the business of brokering activities with respect to the manufacture, export, import, and transfer of an article listed on the USML and of a foreign defense article and defense service of a nature described on the USML, to wit, anti-tank launchers, grenade launchers, and mortar rounds, without having first obtained a license or other written authorization from the DDTC.

(Title 22, United States Code, Sections 2778(b) and (c);
Title 22, Code of Federal Regulations, Sections 129.3, 129.4,
129.8, and 129.10; Title 18, United States Code, Sections 2 and
3238.)

## COUNT FOUR

(Violation of the Arms Export Control Act -- United Arab
Emirates)

The Grand Jury further charges:

59.  The allegations set forth in One through Thirteen,
Sixteen through Forty, and Forty-Four through Fifty-Three are
incorporated by reference as if set forth fully herein.

60.  From at least in or about August 2015, up to and
including at least in or about November 2015, in the Southern
District of New York, China, and elsewhere outside of the
jurisdiction of any particular State or district of the United
States and for which one of two or more joint offenders is
expected to be first brought to and arrested in the Southern
District of New York, GAL LUFT, the defendant, willfully engaged
in the business of brokering activities with respect to the
manufacture, export, import, and transfer of an article listed
on the USML and of a foreign defense article and defense service
of a nature described on the USML, to wit, 5.56mm automatic
rifles, arial bombs, and rockets, without having first obtained
a license or other written authorization from the DDTC.

(Title 22, United States Code, Sections 2778(b) and (c);
Title 22, Code of Federal Regulations, Sections 129.3, 129.4,
129.8, and 129.10; Title 18, United States Code, Sections 2 and
3238.)

## COUNT FIVE

(Violation of the Arms Export Control Act –– Kenya)

The Grand Jury further charges:

61.   The allegations set forth in paragraphs One through Thirteen, Sixteen through Forty, and Forty-Four through Fifty-Three are incorporated by reference as if set forth fully herein.

62.   In at least in or about March 2016, in the Southern District of New York, and elsewhere outside of the jurisdiction of any particular State or district of the United States and for which one of two or more joint offenders is expected to be first brought to and arrested in the Southern District of New York, GAL LUFT, the defendant, willfully engaged in the business of brokering activities with respect to the manufacture, export, import, and transfer of an article listed on the USML and of a foreign defense article and defense service of a nature described on the USML, to wit, unmanned aerial vehicles (UAVs) specially designed to incorporate a defense article, without having first obtained a license or other written authorization from the DDTC.

(Title 22, United States Code, Sections 2778(b) and (c);

44

Title 22, Code of Federal Regulations, Sections 129.3, 129.4, 129.8, and 129.10; Title 18, United States Code, Sections 2 and 3238.)

## COUNT SIX

(Making False Statements to Federal Agents Regarding Arms Trafficking)

The Grand Jury further charges:

63.  The allegations set forth in paragraphs One through Thirteen, Sixteen through Forty, and Forty-Four through Fifty-Three are incorporated by reference as if set forth fully herein.

64.  On or about March 28, 2019, in the Southern District of New York, Belgium, and elsewhere outside of the jurisdiction of any particular State or district of the United States, GAL LUFT, the defendant, who is expected to be first brought to and arrested in the Southern District of New York, in a matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation, to wit, LUFT falsely stated during an interview at the United States Embassy in Brussels, Belgium with federal law enforcement officers and prosecutors, in connection with an investigation being conducted in the Southern District of New

45

York, that LUFT had not sought to engage in or profit from arms deals, and instead merely had been asked by an Israeli friend who dealt in arms to check arms prices so that the friend could use this information in bidding on deals, a request that LUFT said he fulfilled by having CC-1 check prices with CC-2 and then relay this information to LUFT--when in fact LUFT had actively worked to broker numerous illicit arms deals for profit involving multiple different countries, both in concert with CC-1 and directly himself, including as described in paragraphs Forty-Four through Fifty-Three above.

(Title 18, United States Code, Sections 1001 and 3238.)

**COUNT SEVEN**

(Conspiracy to Violate the International Emergency Economic Powers Act)

The Grand Jury further charges:

65.   The allegations set forth in paragraphs One through Thirteen, Sixteen through Forty, and Forty-Four through Fifty-Three are incorporated by reference as if set forth fully herein.

Statutory Background: The Sanctions Regime and the International Emergency Economic Powers Act

66.   The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections

1701 to 1708, confers upon the President authority to deal with
unusual and extraordinary threats to the national security and
foreign policy of the United States.   Section 1705 provides, in
part, that "[i]t shall be unlawful for a person to violate,
attempt to violate, conspire to violate, or cause a violation of
any license, order, regulation, or prohibition issued under this
title."   50 U.S.C. § 1705(a).

     67.   Beginning with Executive Order No. 12170, issued on
November 14, 1979, the President has found that "the situation
in Iran constitutes an unusual and extraordinary threat to the
national security, foreign policy and economy of the United
States" and declared "a national emergency to deal with that
threat."   Since that time, the President has continuously
extended the national emergency with respect to Iran, which
remains in effect.

     68.   On March 15 and May 6, 1995, the President issued
Executive Orders Nos. 12957 and 12959, prohibiting, among other
things, "any transaction, including . . . brokering
transactions, by a United States person relating to goods or
services of Iranian origin or owned or controlled by the
Government of Iran," and on August 19, 1997, issued Executive
Order No. 13059 clarifying the previous orders (collectively,

the "Executive Orders").  The Executive Orders authorized the

U.S. Secretary of the Treasury to promulgate rules and

regulations necessary to carry out the Executive Orders.

Pursuant to this authority, the Secretary of the Treasury

promulgated the Iranian Transactions Regulations (renamed in

2013 the Iranian Transactions and Sanctions Regulations, or

"ITSR"), implementing the sanctions imposed by the Executive

Orders.

69.  Title 31, Code of Federal Regulations, Section 560.206

of the ITSR prohibits, among other things, any transaction or

dealing by a United States person in or related to goods or

services of Iranian origin or owned or controlled by the

Government of Iran, without a license from the U.S. Treasury

Department's Office of Foreign Assets Control ("OFAC").

70.  The ITSR further prohibit transactions that evade or

avoid, have the purpose of evading or avoiding, cause a

violation of, or attempt to violate the ITSR.  *See* 31 C.F.R.

§ 560.203.

71.  The National Iranian Oil Company ("NIOC") is the

Iranian government-owned oil and natural gas producer and

distributor under the direction of the Ministry of Petroleum of

Iran.  In 2010, OFAC identified NIOC as an entity meeting the

48

definition of "Government of Iran" under the ITSR, see 31 C.F.R.

§ 560.304, and added NIOC to the Specially Designated Nationals

and Blocked Persons List.  See 75 Fed. Reg. 34,630 (June 18,

2010).  Engaging in transactions with NIOC is therefore

prohibited under the ITSR.  31 C.F.R. § 560.211.

<u>LUFT's Scheme to Evade Iranian Sanctions</u>

72.  As described below, GAL LUFT, the defendant, worked to

broker deals involving Iranian oil, which he directed an

associate to refer to as coming from "Brazil" instead of Iran,

in an effort to conceal the activity and evade sanctions.

73.  Beginning at least in or about April 2015, GAL LUFT,

the defendant, and multiple individuals from CEFC and/or CEFC

China, including CC-1, exchanged emails about an energy security

conference scheduled to occur in June 2015 in Beijing, China,

which was sponsored by the Think Tank, the Energy Group, CEFC,

and a Chinese think tank.

74.  On or about May 17, 2015, CC-1 sent an email to GAL

LUFT, the defendant, with the subject "VIPs June in BJ," i.e.,

in Beijing, which asked LUFT to "go through the list of invited

speakers coming to the BJ meeting in June and pick out a few

VVIPs whom you think [the then-chairman of CEFC China] might be

interested in meeting in person on the sideline.  And perhaps

also those VIPs who might help the CEFC Company [*i.e.*, CEFC
China] with its businesses so that our people in BJ in the trade
can focus on meeting." The next day, LUFT replied to CC-1,
listing a number of foreign officials with whom the then-
chairman of CEFC China might wish to meet, and then added: "Also
remember the Iranians I told you, which should be done in
privacy." On or about the same date, CC-1 replied to LUFT, "Can
you send me more info on the Iranians?" In subsequent emails,
LUFT provided additional information to CC-1 about the "Iranian
team" that was attending the conference and attached a
PowerPoint "Presentation to Potential Partners: Iran Petroleum
Investments" by a particular oil company (the "Oil Company").
CC-1 (who was staying at a hotel in New York, New York on this
date) forwarded the information and PowerPoint to an assistant
for the purpose of writing a report to the then-chairman of CEFC
China.

75. The following year, on or about February 13, 2016, GAL
LUFT, the defendant, was forwarded an email from an individual
("Individual-3") that asked "whether there could be any interest
from our Chinese buyers (CEFC, HUOC etc al)" in "volumes of
Iranian Light Crude" oil, and that included a link to the
website for NIOC. LUFT replied to Individual-3, "Will check.

The Iranians came to cefc w quite high level - sent even the
niece of the energy min - but left bad impression. They don't
seem to know how to play the game. Were borderline rude. I was
in the room. The price was not great either. Its all about
customer relations."

76.   On or about February 17, 2016, GAL LUFT, the
defendant, informed Individual-3 that "i have positive interest
at $2.50[.]  will develop further[.]  pls refer to as brazil."
On the same date, LUFT emailed another individual with the
subject line "Brazil Light direct from NOC," and quoted
substantially similar terms as the transaction in Iranian oil—
not oil from Brazil—that LUFT had discussed with Individual-3.
In other words, LUFT sought to conceal the Iranian source of the
oil by referring to it as "Brazil Light" instead of "Iranian
Light" (as the subject line of Individual-3's initial email had
referenced) and by describing its source as "NOC" (a national
oil company) rather than NIOC (the National Iranian Oil
Company).

77.   On or about May 15, 2016, Individual-3 sent GAL LUFT,
the defendant, an offer for NIOC crude oil from a petroleum
company addressed to CEFC China.  The offer letter listed the

"origin" of the oil as "Iranian / It can be presented as UAE origin without Iranian papers."

78.   In or about April and May 2016, GAL LUFT, the defendant, exchanged a series of emails with a "Principal Partner and Commercial Director" for the Oil Company ("Individual-4") about an upcoming energy security forum in China.  LUFT told Individual-4 that "CEFC want to meet you in BJ [i.e., Beijing] to discuss you know what.  We will set up the business meetings the day after the forum."

79.   On or about June 22, 2016, GAL LUFT, the defendant, sent an email to CC-1, stating that Individual-4, who was "a good link to Iran deals," would be attending an upcoming forum and could be "potentially useful" for CEFC China.  The next day, CC-1 told LUFT that he would help arrange certain meetings "in BJ" between certain individuals, including a meeting between two CEFC China officials and Individual-4.  CC-1 also told LUFT that LUFT could start organizing the meetings.  CC-1 added, "Please contact [one of the CEFC China officials] for the Iraq lift. Other matters ftf [i.e., face-to-face]."

80.   Several months later, on or about October 10, 2016, CC-2 emailed GAL LUFT, the defendant, that CC-2 had a Chinese client who needed Russian oil, which LUFT confirmed he could

help provide: "I just got off the phone with Russia.  They have this." Forwarding this email exchange to CC-1, LUFT wrote: "If [CC-2] really has this client we need to grab it.  This is exactly what we need. . . . I can get any source on the planet."

STATUTORY ALLEGATIONS

81.  From at least in or about April 2015, up to and including at least in or about June 2016, in the Southern District of New York, China, and elsewhere outside of the jurisdiction of any particular State or district of the United States, GAL LUFT, the defendant, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, knowingly and willfully did combine, conspire, confederate, and agree together and with each other to violate, and to cause a violation of, licenses, orders, regulations, and prohibitions in and issued under the IEEPA, codified at Title 50, United States Code, Sections 1701-1708.

82.  It was a part and an object of the conspiracy that GAL LUFT, the defendant, and others known and unknown, would and did engage in and cause others to engage in a transaction and dealing by a U.S. person in and related to goods and services of Iranian origin and owned and controlled by the Government of

53

Iran, without first obtaining the required approval of OFAC, and

to evade the requirements of U.S. law with respect to

transactions and dealings by a U.S. person in and related to

goods and services of Iranian origin and owned or controlled by

the Government of Iran, in violation of 50 U.S.C. § 1705(c), 31

C.F.R. §§ 560.203, 560.206, and 560.211, and Executive Orders

12957, 12959, and 13059.

(Title 50, United States Code, Section 1705; Executive Orders
12957, 12959, and 13059; Title 31, Code of Federal Regulations,
Sections 560.203, 560.206, and 560.211; Title 18, United States
Code, Section 3238.)

### COUNT EIGHT

(Making False Statements to Federal Agents Regarding Iranian Oil
Deals)

The Grand Jury further charges:

83.   The allegations set forth in paragraphs One through

Thirteen, Sixteen through Forty, Forty-Four through Fifty-Three,

and Sixty-Six through Eighty are incorporated by reference as if

set forth fully herein.

84.   On or about March 29, 2019, in the Southern District

of New York, Belgium, and elsewhere outside of the jurisdiction

of any particular State or district of the United States, GAL

LUFT, the defendant, who is expected to be first brought to and

arrested in the Southern District of New York, in a matter

54

within the jurisdiction of the executive branch of the
Government of the United States, knowingly and willfully made a
materially false, fictitious, and fraudulent statement and
representation, to wit, LUFT falsely stated during an interview
at the United States Embassy in Brussels, Belgium with federal
law enforcement officers and prosecutors, in connection with an
investigation being conducted in the Southern District of New
York, that LUFT had tried to prevent CEFC China from doing an
oil deal with Iran, that LUFT had been excluded from CEFC China
meetings with Iranians, and that LUFT did not know of any CEFC
China dealings with Iran while he was affiliated with the
company--when in fact, including as described above in
paragraphs Sixty-Six through Eighty, LUFT personally attended at
least one meeting between CEFC China and Iranians and assisted
in setting up additional such meetings for the purpose of
arranging deals for Iranian oil, and also worked to find a buyer
of Iranian oil while concealing its origin.

(Title 18, United States Code, Sections 1001 and 3238.)

FORFEITURE ALLEGATIONS

85.   As a result of committing the offenses alleged in
Counts One, Two, Three, Four, Five, and Seven of this
Indictment, GAL LUFT, the defendant, shall forfeit to the United

States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

Substitute Assets Provision

86.   If any of the above-described forfeitable property, as a result of any act or omission of GAL LUFT, the defendant:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third person;

c.   has been placed beyond the jurisdiction of the Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be subdivided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section

2461(c), to seek forfeiture of any other property of the

defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853;
Title 28, United States Code, Section 2461.)

_____                              _____
FOREPERSON                                             DAMIAN WILLIAMS
                                                       UNITED STATES ATTORNEY

57

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

v.

### GAL LUFT,

Defendant.

### SEALED INDICTMENT

22 Cr.

(18 U.S.C. §§ 371, 1001, 3238, and 2;
22 U.S.C. §§ 2778(b) & (c); 50 U.S.C.
§ 1705; 22 C.F.R. §§ 129.3, 129.4,
129.8, & 129.10; 31 C.F.R. §§ 560.203,
560.206 & 560.211; Executive Orders
12957, 12959, & 13059.)

DAMIAN WILLIAMS
United States Attorney

*Foreperson*

11/1/22 Sealed Indictment filed. Arrest warrant issues.
TMK.

Barbara Moses
U.S.M.J.